J. S69017/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
SCOTT DOUGLAS OLIVER, : No. 3092 EDA 2013
:
Appellant :


Appeal from the Order Entered October 14, 2013,
in the Court of Common Pleas of Northampton County
Criminal Division at No. CP-48-CR-0002354-1989


BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., AND STABILE, J.


MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED FEBRUARY 26, 2015**

Appellant appeals the order denying appellant's petition filed pursuant

to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§9541 to 9546.

Finding no error, we affirm.

We adopt the factual summary employed by this court when we

affirmed appellant's judgment of sentence and first PCRA petition:[1]

> [Appellant] supplied beer to a group of minors
> which included the victim, 11 year old Melissa
> Jaroschak, for a party on the afternoon of August 20,
> 1989. During the day, [appellant] was seen
> spending time alone with the victim and occasionally
> walking with his arm around her. They left the party
> together at about 8:30 p.m. that evening.

---

[1] Appellant filed a PCRA petition while his direct appeal was pending. It was denied and appealed, and this court resolved both appeals by the same panel and memorandum.

Melissa never arrived home. The following day, family and friends began a search for her. In the ensuing investigation into Melissa's disappearance, the Easton Police learned that [appellant] had left the party with Melissa. When the police contacted [appellant], he told them that he had walked Melissa home after the party, but denied any knowledge of her current whereabouts. Later that afternoon, the police were unsuccessful in attempting to contact [appellant] a second time. The police told [appellant's] mother to make him available the next day for questioning regarding the victim's disappearance.

Late that evening, the victim's body was found near abandoned railroad property on the south side of Easton. The subsequent autopsy revealed that she had been beaten about the face and head, choked, raped, sodomized, and strangled with her own sweatshirt the previous evening.

Following the discovery of Melissa's body, the police contacted the six juveniles who had been at the beer party on August 20th. All of the juveniles essentially told the same story: [Appellant] had purchased the beer for the party, and [appellant] and the victim had left the party together. In addition, one juvenile told the police that [appellant] had offered him marijuana. Based upon this information, the police obtained an arrest warrant for [appellant], charging him with furnishing liquor to minors and corruption of minors.

Pursuant to the arrest warrant, [appellant] was arrested at 6:45 a.m. on August 22, 1989. Shortly before the police arrived, [appellant's] mother had awakened him so that he would be ready to meet with the police that morning to answer questions regarding Melissa's disappearance. [Appellant] was informed of the arrest warrant and the charges against him, and was then transported approximately two blocks to the police station.

> After [appellant] was read his <u>Miranda</u> rights, he signed a "rights arid waiver form" acknowledging that he understood his rights and voluntarily waived them. During the subsequent interrogation, [appellant] confessed to the crimes regarding Melissa. [Appellant] signed, dated, and initialled [sic] a four page confession, handwritten by the interrogating officer, which detailed the beating, strangulation, and rape of Melissa. He also admitted furnishing beer to the juveniles. [Appellant] was immediately arrested for criminal homicide, rape, involuntary deviate sexual intercourse, and indecent assault.

*Commonwealth v. Oliver*, 635 A.2d 206 (Pa.Super. 1993) (unpublished memorandum), August 20, 1993, slip memorandum at 2-3.

On February 9, 1991, a jury found appellant guilty of first degree murder, rape, involuntary deviate sexual intercourse, and indecent assault. Appellant was sentenced to life imprisonment for murder that same day. On October 16, 1992, additional consecutive sentences were imposed on the other charges.

On August 20, 1993, this court affirmed the judgment of sentence, and on February 9, 1994, our supreme court denied appeal. *Commonwealth v. Oliver*, 635 A.2d 206 (Pa.Super. 1993) (unpublished memorandum), *appeal denied*, 639 A.2d 30 (Pa. 1994). As noted, the denial of appellant's first PCRA petition was affirmed at the time his judgment of sentence was affirmed. The record shows that a subsequent PCRA petition was denied on July 1, 2002, as untimely.

On January 14, 2010, the Innocence Project filed the instant PCRA petition on appellant's behalf after receiving a December DNA test of one of the victim's vaginal swabs. The test excluded appellant from male genetic material found on the swab.[2] We note that the lab report from Orchid Cellmark, the company that performed the DNA test, bears the following disclaimer:

> Orchid Cellmark expressly disclaims any and all responsibility regarding the identity of the items received on September 9, 2009 listed above [the swabs and DNA extract from the victim and appellant]. These items were not collected in accordance with standard chain of custody procedures and, therefore, the DNA results may not be admissible in a court of law or any other judicial, administrative or quasi-legal hearing. The results in this report are intended for informational purposes only.

Report of Laboratory Examination, 11/12/09 at 1.

Subsequent DNA tests proved either inconclusive or failed to exclude appellant. At this point, the Innocence Project sought and received permission to withdraw from appellant's case. On March 9, 2012, a hearing was held on appellant's PCRA petition, and on November 13, 2012, the PCRA court denied appellant's petition. In its subsequent opinion, the court based its decision on the fact that the post-conviction DNA evidence "falls short of

---

[2] It is unclear what this genetic material was. A forensic pathologist testified at appellant's trial that there was no sperm or other evidence found that the perpetrator had ejaculated. (Notes of testimony, 1/31/91 at 3096, 3150.)

the convincing scientific demonstration of actual innocence." (PCRA court opinion, 11/13/12 at 15.)

On appeal, this court vacated the PCRA court's order because the PCRA court failed to use the proper standard for granting relief on the basis of after-discovered exculpatory evidence; the petitioner need not establish actual innocence, but only that the new evidence likely would have changed the outcome of the trial. ***Commonwealth v. Oliver***, 82 A.3d 466 (Pa.Super. 2013) (unpublished memorandum), June 21, 2013, slip memorandum at 4. This court also ruled that the PCRA court considered other improper evidence in reaching its decision. On October 14, 2013, the PCRA court again denied appellant's petition. In an opinion issued that same day, the PCRA court employed the correct standard and otherwise cured the errors this court had previously noted. This timely appeal followed.

Appellant raises the following issues on appeal:

1. IS THE PCRA COURT'S OPINION DATED OCTOBER 14, 2013, UNREASONABLE IN VIEW OF THE FACTS, AND CONTRARY TO THE LAW OR ORDER ISSUED BY THE SUPERIOR COURT OF PENNSYLVANIA ON JUNE 21, 2013?

2. IS THE PCRA COURT'S DECISION UNREASONABLE IN VIEW OF THE FACTS, AND CONTRARY TO THE LAW, BY HOLDING THE NEWLY DISCOVERED EXCULPATORY DNA EVIDENCE WOULD NOT HAVE RESULTED IN A DIFFERENT OUTCOME WHEN BALANCED AGAINST THE COMMONWEALTH'S PURELY CIRCUMSTANTIAL EVIDENCE?

> 3. WAS THE COURT'S DENIAL OF THE PETITIONER'S PCRA UNREASONABLE AND ERRONEOUS UNDER THE LAW IN VIEW OF THE AFTER-DISCOVERED EXCULPATORY DNA EVIDENCE?

Appellant's brief at 3. Although appellant purports to set out his argument as three issues, he is essentially arguing only one issue: that the PCRA court erred in determining that his after-discovered DNA evidence would not have changed the outcome of his trial.

Our standard of review for an order denying post-conviction relief is whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. *Commonwealth v. Franklin*, 990 A.2d 795, 797 (Pa.Super. 2010). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Id.*

A PCRA petition must be filed within one year of the date that the judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1). This time requirement is mandatory and jurisdictional in nature, and the court may not ignore it in order to reach the merits of the petition. *Commonwealth v. Taylor*, 933 A.2d 1035, 1038 (Pa.Super. 2007), *appeal denied*, 951 A.2d 1163 (Pa. 2008).

Appellant's judgment of sentence became final on May 10, 1994, 90 days after our supreme court denied appeal, and the time for seeking further review with the United States Supreme Court expired. *See*

42 Pa.C.S.A. § 9545(b)(3); Rules of the Supreme Court of the United States, Rule 13.1. The instant petition, filed January 14, 2010, is manifestly untimely and cannot be reviewed unless appellant invokes a valid exception to the time bar of the PCRA. *See* 42 Pa.C.S.A. § 9545(b)(1)(i-iii).

In his PCRA petition, appellant asserted an exception under the after-discovered facts exception, 42 Pa.C.S.A. § 9545(b)(1)(ii), that being the newly received DNA test results. We initially note that any petition purporting to invoke one of the time of filing exceptions must be filed within 60 days of the date the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2). Appellant's counsel received the test results on December 7, 2009. Consequently, appellant's petition claiming this exception was timely filed, and we may proceed to review it.

We find that the PCRA court properly denied appellant's request for a new trial. First, the results from appellant's initially exculpatory DNA test are unreliable because as Orchid Cellmark indicated in its report, proper chain of custody procedures were not followed. Second, the evidence at trial against appellant was substantial and was catalogued by the PCRA court in its opinion:

> 1. <u>Detective William A. Wilkinson, Jr.</u>
> Detective Wilkinson testified that he took a statement from the Petitioner on August 22, 1989, wherein the Petitioner admitted to killing and sexually assaulting the Victim. He had transcribed an exact account of this confession, which the Petitioner had then signed. The Petitioner had also initialed each of his *Miranda* rights.

According to the Commonwealth, this statement is consistent with the forensic pathologist's opinion and includes details that only the killer would know.

### 2. Jose Ocasio

Jose Ocasio testified that the Petitioner had confessed the crime to him while they were together in Northampton County Prison. His account included graphic details of the sexual assault and the murder and was consistent with the Petitioner's statement to Detective Wilkinson.

### 3. Mindy Amato

Mindy Amato was the Victim's best friend. She testified that the Petitioner was with the Victim on the night of the murder. He kept asking her if she was ready to go home. At 8:30 p.m., the Petitioner stated that he would take the Victim home.

The next morning, Ms. Amato confronted the Petitioner about the Victim's disappearance. She noticed that his feet were very dirty and had dirt caked on them. He had scratches on his face and was angry that people kept coming to his house to ask where the Victim was. At various points, the Petitioner told her three different stories about the events of the prior evening. He had acted "very nervous" and mad.

### 4. Joshua Braggs

Joshua Braggs corroborated Ms. Amato's testimony with regard to the dirt on the Petitioners legs and his presence with the Victim on the night of the murder.

### 5. Lark Rose

Lark Rose testified that she had observed scratches on the right side of the Petitioner's neck the day after the murder. She described him as appearing scared.

### 6. David Blanar

David Blanar testified that he had observed the Petitioner with the Victim on the night of the murder. The Petitioner was putting his arm around the Victim

and rubbing her back. He saw the Petitioner and the Victim depart together, as she had to be home by 9:00 p.m.

7. William Shannon

William Shannon testified that, on the night of the murder, he had observed the Petitioner and the Victim together with a group of friends. He saw the Petitioner leave with the Victim at about 9:00 p.m. The next morning, Mr. Shannon and others went to the Petitioner's home to ask about the Victim. He remembered the Petitioner as having dirty toenails.

8. Frank Rose

Frank Rose testified that he was in the Petitioner's presence the day after the murder and noticed that his lower legs were dirty.

9. James Ciaramitaro

James Ciaramitaro testified that he had observed the Victim leave the area with the Petitioner on the night of the murder.

10. Officer Michael Orchulli

Officer Orchulli testified about finding the Victim's body along the Lehigh River near the old railroad loading dock. The Victim was on her back, naked except for her bra and one sneaker. Her body was very dirty and had bruises and scratches on numerous parts of it.

11. Barbara Reilly

Barbara Reilly was a forensic scientist with the Pennsylvania State Police. She testified to finding two (2) hairs on the Victim's pubic region that did not belong to her. She undertook a microscopic analysis of the Petitioner's hairs and found that they were consistent with the unknown hairs found on the Victim. In addition, Ms. Reilly concluded that the hairs were consistent with having come from a black person. The Petitioner is black.

12. Dr. Isadore Mihalakis

> Dr. Mihalakis, a forensic pathologist, performed the Victim's autopsy. He observed bruises and scratches in various places on her body. He also described a large bruise on the side of her face consistent with a punch or a slap. He found scratches and bruises on the Victim's back, which suggested she had been held down while she struggled. His examination revealed that a human being had forcibly penetrated the Victim vaginally and anally. The Victim's body and clothing had black dirt like deposits, and the body was soiled.
>
> Dr. Mihalakis had performed swabs, smears, and washes on the Victim's mouth, genital organs, vagina and anus for an entity called acid phosphate-P30 protein, DNA and sperm. Wet preparations of the vulva, vagina, anus and mouth had not revealed the presence of sperm. There was no evidence that the assailant had ejaculated.

PCRA court opinion, 10/14/13 at 4-6.

Third, appellant baldly claims that his confession was coerced. Even if we were to accept that the police somehow induced appellant to confess, the confession is nonetheless highly damning because appellant knew details that only the killer would know. For instance, appellant admitted in his confession that he choked the victim with her sweatshirt and that he choked her until she was quiet. (Notes of testimony, 1/30/91 at 2678, 2682.) The victim did, in fact, die of strangulation. (Note of testimony, 1/31/91 at 3122.)

Fourth, appellant's claim that the DNA results would bolster other exculpatory trial evidence is not correct. Appellant cites the fact that white skin was found under the victim's fingernails (as noted by the PCRA court,

appellant is African American). That characterization does not accurately reflect the actual trial testimony which occurred during cross-examination of the forensic pathologist as to his autopsy report:

> Q. O.K. There was another black hair fragment or fiber under the fingernail clippings from the right hand. Is that correct? That's the next sentence.
>
> A. One had a minute black fragment on it.
>
> Q. And black soil particles and white – parenthesis – dried skin – question mark – parenthesis on the clippings.
>
> A. Yes.
>
> Q. So there was a white substance found under one of the fingernail clippings that you thought might be dried skin. Is that correct?
>
> A. Or it could have been when they cut fingernail clippings, some of the inside of the nail lining shreds off.
>
> Q. You didn't know?
>
> A. Right. I could not know.

Notes of testimony, 1/31/91 at 2990-2991. Thus, the forensic pathologist testified that he did not know what the substance was under the fingernail clipping. Likewise, the autopsy report was also speculative because after it suggested dried skin, a question mark was inserted.

Appellant also cites to evidence that he had no scratches or bruises on his body, that dirt taken from his feet did not match dirt found on the victim's body, and that certain hairs taken from the victim were not

positively identified as coming from him. To this we respond with an adage familiar to criminal law: "[A]n absence of evidence is not evidence of absence." *Commonwealth v. Brooks*, 875 A.2d 1141, 1147 (Pa.Super. 2005). In other words, the failure to find scratches, a soil sample match, or a hair sample match do not indicate that appellant was absent from the crime scene. That "evidence" is simply not exculpatory.

In sum, we agree with the PCRA court that appellant's new evidence would unlikely result in a different outcome at trial. Consequently, we will affirm the order below.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2015